538 So.2d 871 (1988)
NORTH BROWARD Hospital DISTRICT, d/b/a Broward General Medical Center, Appellant,
v.
Rolanda JOHNSON, a Minor, by and through Her Parents and Next Friends, Benny Johnson and Barbara Howard, and Moises Borten, M.D., et al., Appellees.
Moises Borten, M.D., Appellant,
v.
Rolanda Johnson, a Minor, Etc., North Broward Hospital District, Etc., et al., Appellees.
FLORIDA PATIENTS COMPENSATION FUND, Appellant,
v.
Rolanda JOHNSON, a Minor, by and through Her Parents and Next Friends, Benny Johnson and Barbara Howard, Appellees.
Nos. 4-86-2419, 4-86-2486 and 4-86-2497.
District Court of Appeal of Florida, Fourth District.
December 14, 1988.
Rehearing Denied March 17, 1989.
*872 Ellen Mills Gibbs, Bernard & Mauro, Fort Lauderdale, and Steven R. Berger of Steven R. Berger, P.A., Miami, for North Broward Hosp. Dist.
Thomas C. Heath of Billing, Cochran & Heath, P.A., and Nancy Little Hoffmann for Moises Borten, M.D., and Valerie Shea of Conrad, Scherer & James, Fort Lauderdale, for appellant-Florida Patients Compensation Fund.
Sheldon J. Schlesinger, P.A., Fort Lauderdale, and Larry Klein of Klein & Beranek, West Palm Beach, for appellees-Rolanda Johnson, etc.
DOWNEY, Judge.
A jury returned a verdict for $750,000 in favor of Rolanda Johnson, a minor, by and through her parents and next friends, Benny Johnson and Barbara Howard (Johnsons), and against appellants, North Broward Hospital District d/b/a Broward General Medical Center (the hospital), Moises Borten, M.D. (the doctor), and Florida Patients Compensation Fund (the Fund), arising out of a medical malpractice case. The alleged malpractice occurred during the birth of Rolanda at the hospital in 1983. The Johnsons contend that during the delivery of Rolanda signs of fetal distress went unnoticed and she was born in an asphyxiated state and subsequently diagnosed with bronchiolitis. While in the hospital, she received intravenous lines in her right arm and left leg that infiltrated into her surrounding tissues and muscles, causing necrosis and permanent damage. It was alleged that she suffered permanent brain damage.
With particular reference to the hospital, it was alleged that the hospital was negligent in failing to properly monitor the mother, failing to recognize signs of fetal distress and to take the appropriate steps to immediately deliver the baby, failing to properly resuscitate the baby at birth, and failing to have the necessary equipment in the delivery room for the necessary resuscitation. Furthermore, the complaint states that the hospital failed to have a pediatrician or neonatologist in the delivery room at the time of delivery, or to immediately call those professionals when the baby was delivered in a depressed state, and failing to monitor the baby while she was in the nursery so as to discover the infiltration into the tissues in her right hand or arm and her left leg.
The Johnsons alleged that the doctor was negligent in failing to promptly come to the delivery room when called in order to be present at the time of delivery, failing to properly resuscitate the baby, failing to perform the necessary laboratory studies, x-rays and examinations when the child arrived and attempt to reverse the neurological damage that occurred at birth, and *873 in administering the wrong medication or not administering the appropriate medication.
The Fund was joined in a separate count, since the defendants were members thereof, and it was alleged that the Fund was responsible for damages in excess of $100,000 pursuant to section 768.54, Florida Statutes, and all conditions precedent therein had been complied with.
The first issue presented, raised only by the hospital, is whether the trial court erred in striking part of a question and answer directed to the Johnsons' expert witness regarding the use of a DeLee catheter during delivery of the child. The expert testimony indicates that the appropriate standard of care required use of a DeLee catheter in treating a newborn infant presented on delivery with meconium staining. The evidence reflects that Rolanda had meconium staining during delivery and thus it was critical to determine whether a DeLee catheter was used. During the testimony of Dr. Mastrantonio, an expert presented by the Johnsons, the hospital's counsel asked him a hypothetical question in which one of the assumptions was that the delivering physician bulb suctioned the child and then handed her to Nurse Shaw, who "suctioned the mouth and nose with a bulb syringe, then suctioned the child with a DeLee catheter and administered oxygen." The Johnsons' counsel objected to the hypothetical because all of the facts were not yet in evidence. Upon the assurance of the hospital's counsel that the pertinent facts would be adduced, i.e., that a DeLee catheter had been used, the court allowed the hypothetical to be answered, and Dr. Mastrantonio conceded in his answer that the procedure described in the question would be proper and meet the standard of care required.
Later in the trial, Nurse Shaw was called as a witness by the hospital and interrogated regarding her part in the care administered during and after the delivery of Rolanda. She was asked if she had a procedure and policy that she followed any time she encountered an infant with meconium staining during delivery. Upon being asked what that procedure was, the Johnsons' counsel objected. Then the hospital's counsel asked Shaw a hypothetical question involving facts like those at bar and asked what procedure she always used. Objection to that question was sustained. Counsel then asked her what procedure she followed. Shaw answered: "Okay. You suctioned." Counsel asked: "How did you suction?" She answered: "Bulb Syringe suction, DeLee, then oxygen stimulate." Then, on cross-examination by the Johnsons' counsel, Shaw said she could not tell what she did in this case. She testified: "I can only say  refer to the chart." "I have no independent recollection of this chart." She then acknowledged that the chart showed that a bulb syringe was used, but it did not mention the use of a DeLee suction device. She further admitted that, if the DeLee suction catheter had been used, it would normally have been noted in the chart.
At the close of the evidence, on motion the court struck that portion of the hypothetical question and answer given by Doctor Mastrantonio that included the use of the DeLee catheter. The court instructed the jury that it had stricken from the hypothetical the fact that Shaw had used the DeLee catheter. That, said the court, is a fact in issue and you, as the jury, must determine that issue. Finally, the court advised counsel they could argue that question to the jury.
There is no question that Shaw could not recall what she did on the day in question and the hospital chart failed to reflect that a DeLee catheter had been used, although it was customary to show it on the chart, if used. Thus, there was no evidence to support that portion of the hypothetical referring to the use of a DeLee catheter. Further, the attempt to prove that Shaw had a procedure and habit in all cases was never adequately shown. In our opinion, the hospital cannot rely upon Nationwide Mutual Insurance Company v. Jones, 414 So.2d 1169 (Fla. 5th DCA 1982), because the evidence in the present case does not measure up to the requirements of that case. There, the insurance agent testified that he *874 always discussed uninsured motorist coverage with every insured and he was certain he had done so in that case. That case, like Jarrard v. Associates Discount Corporation, 99 So.2d 272 (Fla. 1957), meets the test of some proof that the customary practice was followed in the particular instance in question. Moreover, "the trial judge must of necessity be granted a great deal of discretion in ruling upon the qualifications of expert witnesses and the propriety of the questions expounded." Warning Safety Lights, Inc. v. Gallor, 346 So.2d 92 (Fla. 3d DCA 1977). Thus, it has not been demonstrated that the trial court's ruling on this question was reversible error.
The second point presented by the hospital, the doctor and the Fund is whether the trial court erred in instructing the jury on loss of future earning capacity because the evidence was insufficient to justify that element of damage going to the jury.
There is substantial evidence that Rolanda suffered permanent irreversible brain damage resulting in her being borderline or mildly retarded. One of appellee's experts testified that he did not believe she would be a meaningful member of the work force, that she is not normal, she is "mildly retarded" and would have problems in learning and in becoming an effective member of any kind of work force. In other words, the evidence demonstrates that Rolanda's capacity to labor has been diminished as a result of her permanent retardation. Allstate Insurance Company v. Shilling, 374 So.2d 611 (Fla. 4th DCA 1979). There was expert testimony that she will need special education and rehabilitation for the next five to six years, if not longer, and she would require a special program later in high school. We believe the evidence is sufficient to create a jury question as to whether Rolanda's future earning capacity has been impaired. Platt v. Schwindt, 493 So.2d 520 (Fla. 2d DCA 1986), Hatfield v. Wells Brothers, Inc., 378 So.2d 33 (Fla. 2d DCA 1979), cert. denied, 388 So.2d 1119 (Fla. 1980).
The mere fact that the jury awarded the Johnsons a sizeable amount for Rolanda's special education and rehabilitative services does not necessarily mean it will effectively overcome her mental deficiencies. That was a question for the jurors to decide  and with Rolanda's meager family environment, it could well have decided that her chances to overcome her deficiencies and earn a decent living are slim.
Shilling and some other cases suggest that, in the case of an adult, future loss of earning capacity should only be considered where there is a showing from which the extent of the pecuniary loss can be estimated with reasonable certainty. However, the majority of jurisdictions recognize that such is not the case when dealing with a minor. See Annotation, Sufficiency of Evidence, in Personal Injury Action, to Prove Impairment of Earning Capacity and to Warrant Instructions to Jury Thereon, 18 A.L.R.3d 88 (1968). In such cases the jury can consider factors such as age, life expectancy, health, habits, talents, skills, experience and training, if any. A typical case is Sadlowski v. Meeron, 240 Mich. 306, 215 N.W. 422 (1927), in which an eleven-year-old boy's injury affected his mental development. No evidence of pecuniary loss was available. Still, the court held that, under the circumstances usually found with minors who have no earning or employment record, they should not be deprived of the right to recovery for an impairment of future earning capacity. Rather, it is a matter within the ken of an enlightened jury. See also Newman v. St. Louis-San Francisco Ry., 369 S.W.2d 583 (Mo. 1963).
We have considered the contention that the verdict is excessive and fail to find the size of the verdict such as to offend the conscience of the court and require a remittitur or new trial.
Accordingly, the judgment appealed from is affirmed.
HERSEY, C.J., and ANSTEAD, J., concur.